CHAMBERS *v*. CHAMBERS.

4-9690                                    246 S. W. 2d 124

Opinion delivered February 18, 1952.

*Shaw & Spencer* and *Collins & Garner,* for appellant.

*Hal L. Norwood* and *E. K. Edwards,* for appellee.

GEORGE ROSE SMITH, J. The appellants, the four daughters of William and Miami Chambers, brought this suit for the partition of 235 acres of land, alleged to have been owned by William Chambers when he died intestate in 1944. The appellees, defendants below, are the appellants' two brothers, Frank and George Chambers. Part of the land was occupied by the parties' mother until her death in 1949, and thereafter this suit was filed. By cross-complaint the appellees asserted that they are the owners of 150 acres of the land, under an oral contract of purchase made with their father in 1916. This is the only disputed issue in the case. The chancellor, finding that the oral agreement had been made and performed, quieted title in the two brothers as against the four sisters.

It is familiar law that both the making and the performance of an oral contract for the sale of land must be proved by evidence that is clear and convincing. *Hudspeth* v. *Thomas,* 214 Ark. 347, 216 S. W. 2d 389. The rule applies with especial force when a gift between members of a family is involved, *Meigs* v. *Morris,* 63 Ark. 100, 37 S. W. 302, and while the present case does not involve an outright gift it is quite evident that William Chambers acted very generously in fixing the terms of the sale to his sons. The principal question upon this appeal is whether the appellees' proof has that degree of cogency that is required in cases of this kind. We have concluded that the testimony amply supports the chancellor's decree.

In 1913 William Chambers and his brother John jointly owned 185 acres which included the 150 acres now

in dispute. On April 15 of that year William bought his brother's half interest in the 185 acres for $1,000, the sale being on credit with no specified terms of payment. A deed was prepared and signed by John and his wife, but, as will be seen, this deed was not delivered until the purchase price was finally paid in full in 1942, about two years after John's death.

In 1916 Frank Chambers, then a young man of twenty-three, was farming the cleared land on the 185-acre tract and paying his father a little rent. George, the younger brother, worked for his father on the home-place, which adjoins the 185 acres. Both Frank and George testified that one day in the fall of 1916 their father offered to sell them all the 185-acre tract except the west 35 acres, which he wished to retain as pasture land. The terms were to be that the boys should assume and pay the $700 debt that was still owed by William to his brother John upon the purchase of John's half interest. Frank and George agreed to the proposed sale. The next morning William told the boys that he had talked to John, that John would accept them as "paymasters," and that they were the owners of a farm. The record is replete with testimony that William Chambers and his wife were anxious to have their sons continue to live near them, which may explain the liberal terms offered by the father.

Frank and George went into possession of the 150 acres in 1916 and paid no more rent to their father. They cleared about twenty-one acres of new ground, built a barn, hauled about 2,000 wagonloads of rock to construct a levee, and put up a mile and a quarter of fences. Part of this fencing was a cross fence that separated the 150 acres from the 35-acre tract which adjoined the father's farm and had been retained by him. In addition to making these improvements Frank or George paid the taxes every year from 1916 down to the date of trial.

In 1923 Frank moved to California, having agreed that George should remain in possession and pay the taxes and the debt to John Chambers. George continued to live on the property until he too moved to California

shortly after his father's death in 1944. During his occupancy George exercised dominion over the land, cut and sold timber, and made payments from time to time on the purchase price. The final payment, of $150, was made to Mrs. John Chambers in 1942, her husband having died in 1940. She testified that she understood that William had turned the place over to his sons. She said that when William brought her the final balance he said that George had sent it. Mrs. Chambers then delivered to William the deed that she and her husband had executed back in 1913, and it was recorded a few months later. On being asked whether William had requested that a substitute deed to Frank and George be prepared, Mrs. Chambers answered: "No, sir, he [William] was supposed to do that."

Both within and without the family the land now in controversy was considered to belong to the appellees. It was often referred to as Frank and George's land. When one of the sisters wrote to George in California she remarked that her son was mowing the pasture that morning; "he has your field looking good." After William Chambers died in 1944 another daughter, Nancy, looked after the affairs of her mother, who could not read or write. Nancy admitted that she paid the taxes annually upon the rest of her father's estate but she did not pay those on the 150 acres. The brothers continued to pay those taxes, although the land lay idle and untenanted in their absence.

It cannot be doubted that William Chambers made an effort to convey the property to George and Frank after it was paid for in 1942. William told George that he had signed the deed and that he would obtain his wife's signature "if he could get mother away from Nancy," the unmarried daughter who lived with her parents until they died. A banker, called as a witness by the appellants, testified that a deed to Frank and George was left with him and that Mrs. Chambers was to come in and execute it. She did come to the bank for that purpose, but she first asked whether Frank and George would share in the rest of the estate if she executed the deed. Upon being told that they would she refused to sign the

deed and left the bank. It is impossible to believe that Mrs. Chambers would have gone trustingly to the bank to execute a deed which she could not read had it not been at her husband's suggestion.

Hardly a single fact we have mentioned is directly contradicted anywhere in the record. The appellants argue that the oral agreement of 1916 was not sufficiently definite as to the terms of payment and that the appellee's possession and improvements were not referable to the contract. That the agreement fixed no certain time for payment is an objection that might have been interposed by William or John Chambers, but it is too late for the appellants to raise the point after the interested parties have accepted complete performance. And we think the evidence sufficient to show that Frank and George's activities were pursuant to the contract of purchase. They took possession, paid the taxes, made improvements, put the land under fence, and sold timber, all of which indicate a claim of ownership. George registered the land in his own name with the government and received federal benefit payments as the owner. Mrs. John Chambers understood that the boys had taken over the property and were making the payments. These circumstances, together with the father's undisputed attempt to convey the land to his sons, convince us that Frank and George were not occupying the land through their father's indulgence alone.

It is also argued that the appellees were guilty of laches in not bringing suit as soon as the land was paid for in 1942. There was then no pressing reason for them to take such action; they were in possession and their ownership was not questioned until their sisters sought partition. We scarcely appreciate the justice of depriving these men of their property simply because they failed to take the precaution of filing a lawsuit against their elderly and infirm parents.

Affirmed.